Can you call the first case? 16-0932 Carolyn Howard v. Northwestern Medical Faculty Foundation All right. Can the attorney's approach the department please? Identify yourself for the record. Good morning. I'm Scott Howey. I represent the defendant, Apple Lant, Northwestern Medical Faculty Foundation. Good morning, Mr. Howey. Good morning, Your Honor. This is Lurie Rogers, Jr. I represent the Apple Lee, the Howard family, Carolyn Howard. Mr. Howard, how much time do you want for your argument? Thirteen minutes. I'd like to reserve two minutes for rebuttal. Great. Mr. Rogers? I would like thirteen minutes. All right. Mr. Howard, you can proceed. We tend to ask a lot of questions. We won't penalize that for your time, so go right ahead. Counting on it, Your Honor. May it please the Court. I am Scott Howey, and I represent the defendant, Apple Lant, Northwestern Medical Faculty Foundation. This appeal concerns whether Northwestern committed any discovery violation or had any unfair impact on the plaintiff, and if so, whether the trial court is justified in discarding the work of the jury and ordering a second trial to be held. The answer to both questions is no, calling for the reinstatement of the jury's verdict for Northwestern. Mr. Howey, does the use of the third-party record copy, or whatever we're calling it, U.S. legal, does that use of the third party abrogate your need to supplement the discovery? It is the discharge of the duty to supplement the discovery, Your Honor. It is a request, and this case was made of Northwestern in open court in 2011 as to whether there or whether Northwestern was in possession of any home health care records, medical records, was the nature of the request. Northwestern answered truthfully that it had none at the time. It was only after that that it issued a subpoena to determine whether there might be any such medical records to discover. Was there any shorts of the subpoena at that time in response to the case management order of September? It was not. It was not in direct response. Was it a subpoena? Well, it was in response in the sense that it was prompted by it. It was not required by the case management order. It was in the nature of a housekeeping matter, I suppose. Since Northwestern had no such records at the time, as it said, it was a matter of determining whether there might be any such records to discover. It discovered, in fact, that there were none. But what the subpoena did turn back was some building records and some plans of care, which don't fit the definition of medical records because they don't record the condition or the treatment that was given to the decedent. Mr. Howey, usually when you subpoena a third party, you give notice to the other side, of course, but then you subpoena them, you get the documents, and whatever you get, you share with the other side, right? You don't wait for them to even say anything. It's just a duty to supplement. Isn't that a pretty standard thing in civil litigation? That is one way of doing it. Another way is to do what was done in this case. And, in fact, it's unremarkable and routine for U.S. Legal, the legal vendor in this case, to do exactly what it did, which was to notify all parties, not just the plaintiff, but the other co-defendants who were in the case at the time, that a subpoena had been issued to Compassionate Home Care, and they were given the opportunity, all parties were given the opportunity at that time to anticipatorily request any documents that might be returned. Who requested the Walgreens information? I believe that was also requested by Northwestern, although I can't say for certain. By the head instance, the attorneys for Howard made their own requests. They got those through U.S. Indeed, they did. So do you think that absolves you of any responsibility for making sure that all the documents that you obtained are also in possession of the plaintiff? The fact that the plaintiff could escort themselves is enough? It's a discharge of the responsibility to make those documents available. And what's your basis for saying that? There's no statute that governs it. There's no case law that governs it. So what is your basis for saying that your duty is discharged based on using U.S. legal? It's not simply the use of U.S. legal, Your Honor. I don't want to suggest that that in and of itself might be enough in any case by itself. The fact is that in this case, though, we have further activities beyond what U.S. legal, beyond the mere use of U.S. legal and the issuance of the subpoena. There is the contact from U.S. legal to all parties, which Northwestern properly and correctly expected U.S. legal to undertake, to contact everyone in the case and notify them first that a subpoena had been issued. You're talking about a written contact? Written contact, yes. And that's a record that that information was sent to all parties. What if there had not been a written contact? What if there had not been a written contact? If there was not a written contact, then we would have a different situation. That would be a – there would be less reason to expect that the other parties were aware of that subpoena being issued. But France never contested the written contact in this case, is that correct? France has never contested either that the initial written contact, the notification of the subpoena being issued, nor the subsequent contact after the subpoena or after the documents were returned in response to that subpoena when all parties who had not already requested them were contacted to be asked if they wished to request, now that there was something to return. But you didn't know about that, right? You didn't know that U.S. legal had called the plaintiff's attorney's office, right? You may have gotten copied out a letter and said, looks like all the parties have been notified about this, but you didn't know U.S. legal was calling people, did you? We were aware that that was a standard practice. Okay, I understand, Mr. Howey. And I understand it's not disputed that the phone call was made. It's not disputed that the written communication was made. I do understand all that. But when does the duty become discharged? It seems to me that in the – most of the time when you get third-party discovery, you just turn it over to the other side. You don't even wait for – maybe they'll ask. The targetory includes a request that you supplement. Usually a defendant will just do it on their own, right, just to be safe. They'll disclose it. When you do send it to the other side, boom, that's a clean rule. We know that you've discharged your obligation. When you go to a third party and you say, well, as I understand it, this third party has a practice, or maybe the intermediary I'm using has a practice, of telling everybody and giving them a chance. Then where does – when does your duty become satisfied? When you verify that a copy was sent to all the parties, giving them the option to ask for the records? When you know they made a phone call, both, one or the other? It's a less clean rule, right? How are you – unless you're able to show that you have been literally keeping track of this, it seems like just giving them the documents is clean.  And I think, Your Honor, that goes to the question of what a party can reasonably feel comfortable doing. And certainly there might be other situations where somewhat – opinions might differ over what best practices are. And I think the Franciscan Fathers case that we've cited in our briefs addresses this situation. The court there was actually critical of the defendant for not having been more forthcoming, as it put it, in the opinion, with the public report that it had not provided itself to the plaintiff in that case. And it felt that that party had not lived up to its duty, in fact. How did this whole thing – in your brief, you indicate that the documents – one was four pages? What was the other one? There are some – the entire document is approximately six to eight pages long, I believe. It's different documents. Right. There's two sets of documents. One is all – one billing? Did you say something was billing? There are some billing records contained in there. But there was one that was, what, like four pages or something? And it mentioned that there was a reference to Bowen – Ms. Bowen being forgetful? It's a pair of two-page documents that are very similar to each other. All right. Now, how did they get disclosed? Because it's indicated that it was the Howard plaintiff that introduced them through an expert. Is that how they first – when did you tender them, or how did they get tendered? It appears that they were – and the record is not entirely clear on this. Yes, that's why I'm asking. But it is my understanding that they were provided to the plaintiff during the trial. What prompted that is lost to history. You're not – you were not the trial lawyer. I was not. So it's not really clear from the record. But somehow they obtained them. They did. And there was a request for a mistrial. That seems to be in the record. That is correct. And at the mistrial, was there a request for – well, that was denied. Is there some kind of suggestion of a sanction of, well, let's continue the case for a couple of days, the experts can review these things, anything like that? I don't believe there was any such request made. All right. The trial proceeded. The plaintiff was able to make use of these documents at trial. Would the documents have made any difference to the experts during their depositions? Deposition, no. If somebody is saying she's forgetful, wouldn't that make a difference on how Northwestern had to communicate with her regarding her medication changes? Bear in mind, Your Honor, that the documents at issue here are not treatment records. They're not a record of how she was perceived to be. And these are not – and it's a critical distinction to make, in part because it reflects the fact that they were not responsive to the subpoena that was issued. They were simply issued because that's all the – Does that change anything as far as the discovery order? It does, and that's the other part of it. The discovery order reflected the requirement that Northwestern provide patient medical records. Right. Was that the order that we're talking about, the September order? Yes, that is. And it was directed to the parties. I believe that's correct, yes. And it was to medical records? To medical records. But wasn't there a mention of home – but wasn't there a mention from home health – any home health care? That's correct. Medical records specific to home health care. Should we be slicing and dicing with this line about whether something's a medical record or not? Well, to the extent that the plaintiff maintains that this order was a basis for Northwestern having to produce these documents, we can't. We must, I believe. And that's important to recognizing whether or not Northwestern was in violation of that order. Moreover, with respect to the question of whether this document was concealed from the plaintiff in any way, which was a linchpin of the plaintiff's argument, the evidence that was obtained during post-trial discovery, extensive post-trial discovery in this case, illustrates the fact that Northwestern was open and transparent about obtaining this document. So we'll still really talk about concealing? Or isn't it more about giving everything you have? It's not really, you know, whether you've concealed it or not. It's that the duty is to disclose, not – I mean, isn't that the primary duty? Just everything gets turned over. And part of that involves the – And it's usually not doing it via third party. That's correct. And if we were talking about documents maintained by Northwestern, which would be analogous to all of the authority the plaintiff decided in this case, we would have a very different case. If this was Northwestern concealing or simply failing to disclose evidence from its radiology department, to pick a choice at random, that would be something that the plaintiff would have no opportunity to obtain through any means of its own. And that really would be the sort of abuse of the system that the plaintiff complained so much about in this case. That sort of abuse is not what is at issue here. What's at issue here is this open and transparent subpoena process. Is that the point of going to a third party that nobody can hide documents on? Exactly. Because the third party wouldn't have any motivation? That's correct. And Northwestern has no control over that third party or, for that matter, over the legal services vendor who issued the subpoena and received the documents. Mr. Howard, you're asking us to make a ruling based on custom and practice with absolutely no statutory authority to do so and no case law authority that we have found, other than Franciscan Brotherhood. So I guess the basis of my question is, where do we go with any type of record copy service? Are we just going to start crafting our own discovery rules now? Well, in this case, we have facts that show that the documents at issue were available to the plaintiff. That's not in dispute. And it's not in dispute that the plaintiff received notice of this subpoena and received notice that documents had been returned in response to it. So the sort of rule that you're speaking of doesn't need to be that broad. It doesn't need to absolve any parties simply for the use of a copy service such as U.S. Legal. In this case, we know what happened with the documents. We know that they were made available. We know that the plaintiff was notified that they were available, and we know that the plaintiff, for whatever reasons, chose not to obtain them. Regardless of whether those documents are responsive to the September 2011 order or not, the fact that they were made available, that the plaintiff could have obtained them and knew that there were something returned in response to the subpoena, makes this case like Franciscan Fathers, where the court was critical of the defendant for not being more forthcoming, felt that it could have done more and should have done more, but also recognized that there was at least a portion of the onus lay with the party seeking the documents. So how common is this now? How common is using a third-party vendor like this? It's been a little bit of time since I tried a civil case, but I've never used one. If we went and got discovery, we'd do a subpoena, we'd get the documents, then we'd turn them over to everybody else. It was simple, and no one could say we didn't comply because we'd put a cover letter on the discovery and send it over to the other side or fax it, or back then we probably faxed it, emailed it, whatever. This idea that you're going to put it all in the hands of a third party now and just say to the other party, if you want it, go get it, but I don't have to give it to you. You know how to get it, as long as I somehow see that they notified you, or I hope they notified you. As Justice Brooks said, there's no rule governing this. In this case, we're talking not just about documents returned in response to a subpoena. We're also talking about whether the documents met the description of the reason they were being requested, and that's part of that September 2011 order. Speaking about medical records. What did you request? My recollection is the medical records were requested. And what did you get? You're saying it wasn't medical records. It was not medical records. Medical records were no longer in the parties, in the non-parties in Compassionate Home Care's possession because of a detention process. I don't believe they called them anything other than this is all we've got. Yeah, this is all we've got. And at that point, it was no longer whether it was responsive to the subpoena or not. It was simply all they had. And there was nothing on any of those home health care plans regarding her medication, her dosage, her time. Is that correct? There certainly are references to those issues, and they're attached to our reply brief for easy access. But they do refer to those issues, but they are not reports of things that had happened. Treatment or care. Treatment or care or condition, for that matter. These are not reports of anything about what had already been seen with respect to the decedents. Who were the documents presented to then once they were disclosed during the trial? During the trial, they were presented, I believe, to trial counsel. No, they were used at the trial. I'm sorry, they were used at trial before defense expert Dr. Gallagher, the internal medicine expert, I believe. They were first used by the plaintiff's counsel, in fact. And again, one reason that they were not disclosed by the defense sooner was that the defense had no intention of using them. They were only used by the defense after the plaintiff had already used them with the defense expert. Well, that's not something that has anything to do with whether they should be turned over. Do you think that the Compassionate Home Health Director, I already know what you're going to say, but I want to hear what you're going to say. Do you think they would have made a difference in the outcome of the trial? No, Your Honor. They would not. These are not, first of all, Compassionate Home Care was not a party. There's no allegations that Compassionate Home Care did anything it shouldn't have done or failed to do anything it should have done, violated any standard of care. They weren't independent. So based on that statement, do you want to comment on the trial judge's final ruling, the final written order of the trial judge? There's a lot to say about the trial judge's order. I have two things to say about it. And the order goes, in fact, to the question of what this Court's standard of review is. And we acknowledge the standard of review is deferential, ordinarily, to a trial court order granting a new trial. It's abuse of discretion. But what part of the definition of abuse of discretion is a ruling that is, where there's no recognized basis in the record for awarding a new trial? Looking to the Court's order, we have pointed out many, many of the errors, factually, within this brief order. And I won't go through them here. They're in our brief. But it is a barely recognizable account of what happened at trial. And that by itself is enough to suggest an abuse of discretion in the technical sense of the term. Without any disparagement of the trial court, it was simply incorrect in many respects that go directly to the question of whether this document was, in fact, concealed. The trial court did make one finding that is supported by the record, and that is that any noncompliance by Northwestern was unintentional. And that is also part of the question about whether a new trial is called for here. That is a considerable sanction not only for Northwestern, but also for its effect on the judicial system as a whole. To throw out the verdict of a jury that deliberated over this case and to require another jury to address the same issues yet again is not an insignificant thing to do. And given the errors that are contained in the trial court's order, particularly its overlooking of the process by which this document was made available to all parties through an open and transparent subpoena process that is utterly unremarkable and fairly routine, all of those are factors that militate toward reinstating the jury's verdict and finding that a new trial is not required or called for in this case. I would be happy to address any further questions the Court might have. After that, I would simply ask that the Court reverse the trial court's order granting a new trial and reinstate the jury's verdict for Northwestern. Thank you, Mr. Kelly. Thank you. Good morning, Mr. Rogers. Good morning, Your Honor. May it please the Court, Alice Bowen and her family did not get a fair trial in this case. They did not get a fair trial because Northwestern Medical Faculty Foundation violated a court order with regard to the production of discovery. Mr. Rogers, are you contesting the propriety of the process of using U.S. legal? I think that's a red herring, respectfully, Your Honor. The issue and duty and obligation is on the parties to produce and comply with discovery orders. Again, are you contesting whether U.S. legal, the process that was used in this, is an appropriate process? A party can use any number of processes that they choose, but that doesn't negate their obligation to comply with the discovery requirements. So this is all custom and practice, correct? It's not codified anywhere. There's no case law interpreting it. The use of a third-party vendor is custom and practice throughout personal injury. Is that correct? No, I don't agree with that. I think different lawyers do things in different ways, and you cannot negate your obligation simply by choosing some third party. Okay, so are you contesting whether your law firm received notice from U.S. legal? I'm at a disadvantage because none of those communications that are described were to me. They were to someone who was no longer in my office. I understand. I didn't want to lean on or rely upon or reference someone else's error. I got it. My only point was, and I think this matters, Your Honor, parties pursue the discovery in this case in a sequential fashion, fact discovery, treating discovery, then expert discovery. We were at a case management conference. Is this treating discovery? Yes. It is? Why? I mean, it doesn't seem to be there anything in those documents that relates to treatment. I respectfully disagree, and I brought copies for the Court so you can have easy reference as I describe them. It's in the reply brief. It's in the reply brief, but I wanted to specifically point out how these are actually planned medical care records that have significant relevance and are at the heart of this case. If I may provide the Court with copies. I mean, they're in the reply brief. Okay. In essence, Your Honor, what happened was we entered a case management order, a copy of which I have. September 11th order. September 8th, 2011 order. What that order, you ask this question of counsel, what it says, and I'll quote it. Number one, parties shall produce any home health care records in their possession by 9-22-11. Number two, Northwestern's counsel represents to the Court that it has no home health care records. Number three, parties to proceed with remaining plaintiff's expert depositions. The record shows, though, at this point that that was absolutely accurate, was it not? That was accurate at the time. Let's assume you're right. There's a duty to supplement. These should have been supplemented. So now let's go to when you said at the trial that the lawyer or whomever would have received this was no longer with your office, was that the case when the judge granted the motion for a new trial? Yes. The lawyer was gone? It was an assistant, not a lawyer. Those calls were not to a lawyer at all. They were to an assistant. Does the subpoena show, though, that it was actually sent to your office? The subpoena has a, I believe it has a notice of service. Is there any question about that? I don't have a legitimate basis to challenge it, Your Honor. But, again, I don't think that obviates or negates it. I want to assume for purposes of my argument that these things should have been turned over by Northwestern. But what I think is important about the order that's not appreciated when you read the case is that that order was entered as we proceeded into plaintiff's expert discovery with the premise that everybody is on the equal footing and on the same page. The home health care records could not be located or produced up at that point despite numerous efforts to get them. No one got them. So I wanted an order that said, okay, we're on the same page. Not a protective order just to say we're on the same page. No one has something to have an advantage over the other. That is put in the order, a court order, not just a request or a letter. They then, two months later, send a new subpoena dated November 18th, I believe, requesting compliance of Compassionate Health Care by December 2nd. No compliance is provided consistent with the way what had happened earlier. No records had ever been produced. We've never gotten any records by December 2nd. I'm producing my expert witness relying upon the discovery that's been conducted thus far, but we're on the same page. They don't do a rule to show cause to enforce the subpoena. They, I would suggest surreptitiously, have someone in their office start to call U.S. Legal beginning January 26th of 2012. I have a little issue with this. How was it secreted and how is it surreptitious when you're getting notice from the third party? How is that somehow concealing this information? Because the notice you're referencing is something that occurred in April of 2012. What I'm referring to is a subpoena issued November 18th that had a due date of December 12th. It was not complied with by Compassionate Care. They did not seek court intervention by a rule to show cause to enforce the subpoena. They do nothing whatsoever. They take my expert's depositions, and then they start calling, not following a rule to show cause, what I know is calling U.S. Legal saying, hey, can you follow up with Compassionate Health Care? That goes on up through January, the end of January, February, and March. Then they get records produced April 3rd of 2012. What those records say is my theory of the case from the very beginning, that this was an 80-year-old woman. They adjusted her Coumadin dose on January 21st. By January 25th, she developed a hematoma on her spine that caused her paralysis. It was not a dispute that she took too much medication. It was not a dispute that the paralysis was due to a hematoma. Are you saying that Northwestern wasn't, the expert Gallagher didn't say that there was a question about this? There was, wasn't there? There was really no question about the fact that she, the case centered on the standard of care with regard to relaying a change in Coumadin medication. This senior woman who had home health care agents. Didn't the defense expert agree that if she took the medicine with the one bottle and the other, instead of what the doctor had suggested, she was supposed to do four on three days and then five on? Correct. Okay. So didn't the defense doctor agree that if she took it, if she took nine. Yes. Okay. That's correct. Now that could make a difference, but I mean, it was contested about whether she did that or not. Well, because she passed away. She couldn't testify to it. Let's assume you're right, that this information should have been given to you. Yes. Okay. At the end of the day, you have to get a new trial because you have to show that there would have been a different outcome. Correct. All right. Now, the response to all of this is that you haven't really shown what about these documents. You got in that they say somewhere she was forgetful. What else is there that you were trying to get in front of the jury or that what would this have done with your experts? I mean, I'm looking at them now. So what is it? They say you don't really argue this. You don't explain that how this would have assisted your experts. What is it in there? Okay. Judge Flanagan, who entered the order, describes in his order the fact that the issue of medicine dosage was critical, that home health care was important to the case, and he goes on to say that that's... Forget about him. We need to know what is your position, not the judge. We need to know from you today how these documents were going to change the outcome. I will explain that. If you look at the documents, again, I have copies available. Yeah, we have them. They're in the refinery. Okay. The critical time period here is January 21st, when Dr. Hyndman called Nurse Brankle and asked her to call Ms. Ball and change her medication regimen. To give you specifics, what she said was, can you ask the patient to lower her Coumadin dose to 4 milligrams on Monday, Wednesday, Friday, and 5 milligrams the other days, Tuesday, Thursday, Saturday, Sunday? She may need more pills called in. I think she only has fives. You can call in 1 milligram tabs to use as directed. If you think she does not understand these directions, let me know. The home health care records importantly reference visits that go through that period on the first page all the way to January 25th of 2005, and they show that there were home health care aides there on the 19th, 23rd, 24th, and 25th. Yes. If you look at the plan of treatment, the top, category number 10 on the right top. What page are you looking at now? I'm looking at page 83 for the record, Your Honor. Okay. Medications, dose, frequency. What paragraph are you in? It's section 10 in the top right-hand portion. Yeah, yeah. Okay. It lists all the medications. It lists the dosages. It lists the frequency with which she's supposed to take them. It describes coumadin and the time, the day she's supposed to take it, and the amount she's supposed to take. If you look at section 15, it talks about knowledge of emergency. That issue, as you look on the addendum, which is the next page, page 84, talks about her, section 15, safety measures, numbers, medication, precautions, environmental precautions. If you look at section 19 under mental status, the box is checkmarked, but she's forgetful. Section 20 in the middle where it says SN to assess, that's skilled nursing to assess, it says for exacerbation of symptoms of arthritis, pain assessment, mobility, and therapeutic effects of pain medications. Skilled nursing to instruct patient on colon disease process, medication regimen, and proper position. Section 22. I understand what's in these. I'm asking you, you used them with Gallagher, didn't you? Well, yes, because I, the way that. What would this do in terms of the jury's decision? Because the premise of my expert's opinions was that you cannot instruct an 80-year-old person who has home health care and assistance from family on modifications in a significant medication like colon. It's too dangerous. But doesn't the record show that the family members and home health care had nothing to do with ensuring her medication because she was completely confident there was never any. Who said that? The record shows that there was never any, the doctors could not confer with family members regarding her medication. The home health care people were not there to give her medication in the evening. That was not their purpose. But this specifically refutes that. This talks about the skilled nursing and the home health care talking to her about medications. Well, where does it say that? The section I just read. Yeah, I'm sorry. Instruct patient on disease process medication regimen under section 20. Goals, rehabilitation potential, discharge plans, effective anticoagulant therapy with adequate tissue perfusion, the absence of hemorrhage or slow bleeding from sensitive areas. Those all are directly related to the Coumadin dose and the change in prescription. There are addendums. If you look at the second page, 84, there's an addendum that describes a change in the medication of Coumadin. My point is that, and my expert testified, the standard care requires you to tell the home health care so they can be informed, it can be documented, and they can relay that to the patient so she does not take too much medication. Mr. Rafferty, this is to the jury. Pardon me. I'm sorry. Was the jury instructed that one of the allegations of the negligence claim was that Dr. Heyman or Heyman was to tell the home health care person to go over the medicine or was that the job of her nurse, Bramble, or whatever it was? I'm going by memory, Your Honor, but the standard of care, I believe, was the standard of care of the physician. And we were saying that Nurse Bramble was not sufficiently caring. Did you also allege in your complaint that the home health care company, that there was a breach in the standard of care for the doctor and the nurse not to go over with the home health care people the change in her medication? Was that one of the allegations in the complaint? Yes. Those were the opinions of my experts on that point. You can't meet your standard of care with an older woman who's forgetful with a serious medication like this when you know that, when you know she has assistance and she needs help. I'm sorry. This was plaintiff's medical provider or home health care provider, correct? It wasn't the defendant's witness. It was plaintiff's. All right. So where is our due diligence in finding any records from home health care? We repeatedly requested the records again, and then we couldn't get any records. Both sides. That's why the order is answered. Yes, by the September order. Yes, to say we're on the same page. When did you first request the home health care records? I don't have the dates in front of me, Your Honor. Are you saying you requested them before they were destroyed? I don't remember the dates we requested them. I just know that we had difficulty getting records. And let me just point out, Your Honor, if you look at the records that we're discussing, these are physician's orders from Dr. Hyman, okay? At the bottom left corner is Dr. Hyman. She's identified as the person who's relaying the information to the home health care provider. There's a huge question as to why I didn't get it from Northwestern. Why didn't I get the records from Northwestern, okay? And then when we're all on the same page and no one has the records, why do they know something's out there to the point that they start issuing subpoenas in November and then having their staff start to call, not do rules to show calls, but calls January, February, March saying, hey, don't you have something? Don't you have something? I don't know why they all of a sudden had something. I don't know. But all of a sudden, after my expert discovery is completed, they've got records. Then importantly, they're dogmatically subpoenaing the records after we have an order where we're on the same page. They get them. They support my theory, refute their theory because their expert said the standard care does not require you to notify home health care. Why did the judge deny your motion for a mistrial? You tried the case, didn't you? I did try the case. Why did he deny your motion for a mistrial? It was about these things, wasn't it, these home health care papers? I think mistrials are something, yes, it was about these things. And the only reason I found out about it was because defense counsel questioned experts by saying, have you reviewed any home health care records? And I thought that was prejudicial. Why would you try to raise review of records that no one has and no one's reviewed? Why would you give a negative and improper inference for records we don't have? So I started to press him. Do you have records? Do you have records? Then he said, I have records. I was shown the records, and I made a, as the court describes in its order, a detailed argument for mistrial because it was prejudicial. Why did he deny your motion for a mistrial? I think judges are very hesitant to grant mistrials if they can avoid it. But he, the judge. Did you ask for some sort of short continuance to be able to go over these with your witnesses or anything like that? You know, a sanction less than mistrial. We were too far along in the trial to accomplish that because these are records which would refute their experts' opinions. These are experts which Dr. Hyman would have to, as a true doctor. I thought you used them with Gallagher. But my experts could not use them. Dr. Hyman, this record would be a document that would impeach Dr. Hyman's position that she did not have a duty to notify home health care. The document does it. Forget experts. The document does it. So I was immensely prejudiced by getting this in the midst of trial when Dr. Hyman's name is on it. She issued the orders. They got it, and then why wouldn't they give it to their experts? They don't want to be pursued. They don't want to be pursued, not just by subpoena, but by cause. They got it, and then they don't give it to their experts or me or disclosure. Mr. Rogers, do you think the trial court's order should give us any pause? Absolutely not, Your Honor. The issue is whether the trial court's order is correct. Well, there's stuff in there that's clearly not correct. There's a lot of gibberish in there, if you'll pardon my colloquialism. Judge Tom Flanagan was someone that each of us appeared before and each of us agreed to try that case before. Judge Flanagan did a good job on this trial. Judge Flanagan, in his order, specifically describes the issues I just mentioned about why this was prejudicial. He says that the compassionate records dealt with medication regimen, effective anticoagulation therapy, tissue perfusion, possible slow bleeding, and incumbent during this time period. He effectively identified the critical issues that prejudiced the plaintiff. He said there was a discovery order, a court order that was entered that was violated by the defense. He was compassionate toward them and tried to say it wasn't intentional. Quite frankly, I don't know that it wasn't intentional. If it was going to be intentional, though, Mr. Rogers, why would they go through a third party? That's kind of a bad subterfuge, isn't it? Like, we're going to go through a third party that's required to notify you twice that we have documents. So it's not a good – if you're accusing them of malfeasance, it's bad malfeasance. I mean, they're not even accomplishing what they're seeking to accomplish. The malfeasance is not once they got the document and they saw that it supported plaintiff's theory, was consistent with it, and refuted theirs, they continued to disclose and produce experts that contradicted it, more or less put forth a lie before a jury. They told the jury that the standard of care did not require you to notify, and they were doing that for this specific patient. They put forth a lie before this jury, and only through this – Mr. Rogers, are those two things inconsistent to say that the standard of care does not require the doctor to notify home health care, even if, in fact, in this case the doctor did do so? Are those – is that – is one thing contradicting the other? I respectfully believe that the fact that Dr. Hyman is submitting something describing her changes of medication regimen for this patient on Coumadin in a record to home health care refutes and contradicts completely their expert's testimony on the point, completely contradicts it. If I have that document and I cross-examine their expert, how can they say that this is not – I can prove standard of care by prior conduct. This is prior conduct on the part of Dr. Hyman that proves the standard of care my experts testified to. So they get it. Again, don't even pursue it. Through phone calls, no rules to show calls, they get it. Then they don't give it to me, they don't give it to their experts, they don't confront any witnesses with it. Then, at trial, trying to suggest that there are no home health care records that support what I'm saying. You haven't seen any records from a home health care agency. And that's really been alarming, that they try to seek an improper inference from this jury that the records don't support what I'm saying as if I'm hiding. And then, in fact, they're hiding the records and they do support what I'm saying. So, you know, I apologize for raising my voice, but – I was there. I'm sorry. I was there. I saw how this unfolded. I saw how this happened. Judge Flanagan was there. This was prejudicial to Alice Bowman. This was prejudicial to her heirs. This was not a fair trial. Not a fair trial. And respectfully, Judge Flanagan did the right thing in granting a new trial, and they have not met their burden of establishing that he's abused his discretion. This was not fanciful, this was not arbitrary, and this was not unreasonable. It was based on their conduct and not complying with the discovery of the order from the court. And we went to court multiple times after that order on case management conferences, managing the progress of the case, and they never once raised the fact that they got the records. Just to make sure I understand your position, it sounds like when notice was given to your law firm, it wasn't to you, and that person may not be with you, so maybe you're at a disadvantage. But when U.S. Legal, I think it's called, when the third party first served the subpoena, is that when the notice of subpoena went out? This would have been, I think, November is what we're talking about, right? November 18th, I believe, of 2011. Whether you personally know, if we just talk about it in terms of the record, does the record evidence show that it was in November when this was first beginning that your law firm was given notice of it? The record suggests we got a subpoena. You get notice of subpoena back in November. The record suggests that. But let me also point out, Your Honor, interestingly, you typically would use a HIPAA order, an approved HIPAA order. They attached an affidavit signed by an attorney that, quite frankly, I've never seen before used. All of this done, again, after a September 8th order saying we're all on the same page, let's finish expert discovery. They're issuing subpoenas with attorney affidavits, no HIPAA orders. They get no compliance. They start to make phone calls between January and April. I don't know about these phone calls. I don't deal with U.S. legal. And then they get records, and now they say, well, they got medical records. The subpoena, which the court asked about, doesn't say medical records. The court's order doesn't say medical records. It says records, whatever you received, records. Their subpoena doesn't specify medical records. And they're attempting to dodge clear-cut rules of conduct at trial. Everyone's on the same page, share information, let a jury decide based on the evidence and the facts, and let the chips fall where they may. Not surreptitiously hiding things and saying, oh, they're not compliant, they're not responsive to subpoenas, they're not medical records. We don't have a duty because of a third party. And, Mr. Rogers, you discovered this. I know Mr. Howey was not trial counsel, but you obviously were. Yes. So once you heard that question of your expert, kind of an impeachment, you've never reviewed any home health record, that prompted you to inquire of opposing counsel, and that's when you found out about these records? Yes. I objected to the question because it was an improper inference. So you had presumably issued a Rule 237 notice. I had, which they had not produced any response to. They did not produce any response to that either. No. No. So I know it's a strong evidence. Is that clear in the record, by the way? Yes, I state that in my brief. But is it uncontradicted in the record that you did not get it in the Rule 237? Yes, it's uncontradicted. I've never got that. I didn't see that as an issue, but I just want to. I didn't see any effort to refute that, and that's what happened. I got it during trial, on a sidebar, in response to that question. Don't they argue that under 237 those were not records? I don't know what they're called, but they argue that you weren't entitled to them under your Rule 237 in their brief? They do say that. They're trying to recategorize them as something other than records when they deal with crewmen and skilled nursing. They're presented by a doctor. They're presented to home health care clinicians. They want to make them something else in an effort to avoid their duty and obligation and failure to comply with the court's order on the point, my 237 request, and the blatant unfairness that we proceeded to avert it, though. Respectfully, I don't believe they've met their burden, but Judge Tom Flanagan abused his discretion. He did the right thing in this case, and Alice Bowen deserves a new trial. Thank you. Thank you, Mr. Rogers. Mr. Howard? To briefly respond to Mr. Rogers' suggestion that documents were surreptitiously hidden from him, I can only go back to the record and show what Northwestern did to obtain those records. As Your Honor pointed out, if that was subterfuge, it was the worst possible subterfuge. And if Northwestern was trying to- What was the point of your question to the experts? That Mr. Powers just referred to. Not you, but the trial lawyer asked, have you reviewed any home health care records? That was a question that was intended to bring out the fact that there were no home health care records in the sense of medical records, medical treatment records. Was this to Gallagher by the defense attorney? I believe that was to the nursing expert, the plaintiff's nursing expert, which I recall at that time. Oh, plaintiff's nursing expert. Because that was not- counsel may be recalling it correctly or maybe I heard him wrong, but that was not a use of the document. The question was to the nursing expert by defense counsel, the plaintiff's nursing expert by defense counsel, have you reviewed medical records? Medical records? Medical records. Not home health? There was no records? He may have referred to home health care records in the sense of being medical records, but it's the sort of question that's taught in trial advocacy. It's a question that defense counsel knew the answer to. They knew the answer was no. She hadn't reviewed those medical records because they didn't exist. There's nothing improper or suspicious about a question of that nature. What would we call these things if they're not records? They're plans of care. Plans of care. They're not treatment records in the sense of reflecting treatment that was given or a condition of the decedent, the patient that was observed. They are references to the future, not to the past. And in that sense, they're not records. They might be business records in some sense, but they're not medical records. What do we call them in the health care plan, the home care plan? It's referred to as the home health certification and plan of treatment. And consistent with that is the section 22, which the plaintiff's counsel puts so much reliance on as being, as he described it, his entire case. Well, was he incorrect when he said that one of the allegations of negligence was the doctor and or the nurse's failure to confer with home health care about what her medication was supposed to be? That's one of the allegations, I believe, yes. So if that's one of the allegations, why wouldn't these be relevant then? Because they're not, they don't reflect. Maybe that's a broad term, but why wouldn't these be something that should have been turned over long before the trial? Because they don't satisfy the definition of home health care records. And they don't go to the questions that were in dispute before the jury. In particular, section 22 of both reports, both plans of treatment, refer to goals, rehabilitation potential, and discharge plans. These are things that were hoped to be accomplished through the treatment that was to be provided by the home health care service. These are not, they don't go to standard of care. They don't go to causation. They don't go to any of the elements of the plaintiff's case that were in dispute. And that is why these documents, even if they had been withheld or concealed or secreted in some fashion, they were not- Do they show really that she didn't talk to them, or did she simply say, I didn't confer with them? It doesn't address that at all, Your Honor. This is merely a plan of what the home health care service was to do. But it doesn't address what the standard of care was. Is there any indication in there that they had anything to do with making sure she got her medicine? No, there's not. And, in fact, it's uncontested from the record as a whole that they were not involved in administering her medication in any way. How did the record show that? Through which witnesses? I cannot tell you as I stand here. Was it a family member? I believe the family members did testify to that. I do know that it was not in dispute that the home health care workers did not administer her medication because they weren't there at the right time of day. So the Coumadin was supposed to be taken at night? Yes. And that's kind of undisputed? Yes. And these home health care people, persons, were not there in the evening? Correct. They came in sometimes during the day for short periods of time? I believe so. But not at night. And they were hired by the family, is that right? I believe that's also correct. With further respect to the issue of concealment, the non-issue as it is based upon what the record says, the plaintiff's continued characterization of Northwestern's behavior as being deceptive and secretive is inconsistent with anything contained in the record. It's inconsistent with the use of an open and transparent subpoena process that was known to give notice and did, in fact, give notice, both of the subpoena and of the response to it. The suggestion that Northwestern doggedly pursued something that it, quote, unquote, knew was out there, those suggestions are not supported by the record. And, again, they are inconsistent with what the record says. Well, how do you reconcile the order entered into on September 8, 2011, I think is what we're talking about here, whereas Mr. Rogers kept saying that everything was even, we all had the same, we all didn't have the same, and then all of a sudden you start going off and looking for more discovery. What's your response to that? That the request for further discovery, again, was open. There is no suggestion. I understand Mr. Rogers doesn't have a record of it occurring, but it's in a record on appeal that the notice of the subpoena was sent to all parties, including some co-defendants who did request copies of the documents in response to it, that if there was any concern about a HIPAA order or anything being done without leave of court, all those irregularities, if that's what they were, were waived by the plaintiff by not waiving them at that time. There is no question from the record that the plaintiff was made aware of the subpoena at the time that it was issued, was offered the opportunity to obtain whatever might be returned in response to it, and was later offered the opportunity to actually obtain those documents. That's much less of, in fact, the burden of doing so would have been much less in this case, simply checking a box and mailing an order form back, than was involved in the Franciscan Fathers case, where the Second District recognized that even if the defendant had not been as forthcoming as it could have been, the onus remained on the plaintiff to obtain something that was publicly available in that case, but was certainly available among all the parties to this case for simply the check of a box. Did you use U.S. Legal for any other discovery in this case? It was used for, as Justice McBride observed, for... For Walgreens? For Walgreens. Okay. And I don't know the extent of it. It only became an issue, of course, as to these documents. Was there a joint order? Wasn't actually the estate... Weren't they ordered to turn over any home health care records they would have had? Wasn't the obligation on both sides to do this? It said parties. I think that would be... Or was that a reference to just the defendants? I don't read it that way. The order refers, I believe, to all parties. It is not simply to Northwestern. Northwestern is the one that took the initiative to... Who hired this home health care? The home health care, in my understanding, and I don't know that the record reflects this clearly, but my understanding is that it was hired by the plaintiff. So would there have been an obligation upon the plaintiff to tender these if they had received them? Certainly there would have been an obligation to see that they were made available to the defense as well. Well, doesn't that order require both parties to tender any records from home health care? Isn't that what the order was all about? It does. It requires at the time that any documents in their possession be tendered. It's the representation, completely accurate, as you observed, that Northwestern had no such documents at the time. We don't refute that there was a continuing obligation to provide them were they to come into our possession, but they did come into Northwestern's possession. If you're entering into this order on September 8th basically saying, okay, I'm paraphrasing, but aren't you basically saying we're done with discovery? I mean, let's go on to the experts now. I mean, that's how you usually fashion discovery, right? You get everything together so that the experts have everything, and then once they have everything, they can start formulating their opinions, and then you do your 213s, and then the experts take their depositions. And so why, after what appeared to be the close of discovery, maybe not officially, all of a sudden you're, what prompted you to say, hey, let's use U.S. legal and go, you know, subpoena these people? What's different? What happened? I can't speak to the actual motivation of the trial attorney, but I can submit that it's entirely proper in the search for truth, as we sometimes talk about, to find out if there is more information out there. And this was not done in a surreptitious fashion. It was done in a way that included the plaintiff in the notice. There's no dispute about that. And if there was a problem with that, if there was an objection to be made that discovery has been closed or the experts have been deposed and haven't been asked about this, that was the time to make it. There was no such request made. And Northwestern should not be penalized, as the consequences of this case have unfolded, by being the one to search out more information and by being the one to make that additional information available to all parties. There was no discovery closure order, is that correct? Not that I'm aware of, Your Honor, no. And I believe you're correct that discovery was not officially closed at that time. If the understanding was different, then that was something to explore at the time the subpoena was issued and notice was given to all parties. What was the point of the September 8th order then? Because you're right, discovery wasn't closed. What was the point of saying what was said in the September 8th order? It is a peculiar order, I think. It's the statement in an order that a party doesn't have documents is an unusual thing to find in an order. And I can't explain the purpose behind it except to provide an assurance that those documents were not in any party's possession at the time, which was true. The issuance of the subpoena certainly was notice to all parties that conceivably there might be documents out there. We're going to see if we can find them. And that's an implicit invitation to object to that process. If the trial or if the pretrial proceedings or discovery had reached a point where that was no longer appropriate and since no such objection was made and none of those objections were raised, there was really no basis for saying that the subpoena was improper. That was the time to do it. I'd be happy to address any further questions the Court might have. Otherwise, I would simply reiterate my request that the Court reverse the order granting a new trial and restore the verdict in favor of Northwestern. Thank you, Mr. Pollack. Thank you. We'll take the case under advisement and issue an order as soon as possible.